CIVIL ACTION NO. 10-229-GWU

CINDY ARBUTHNOT,                                              PLAINTIFF,

VS.                        **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Disability Insurance Benefits (DIB). The appeal is currently before the court on cross-motions for summary judgment.

## APPLICABLE LAW

The Commissioner is required to follow a five-step sequential evaluation process in assessing whether a claimant is disabled.

1.    Is the claimant currently engaged in substantial gainful activity? If so, the claimant is not disabled and the claim is denied.

2.    If the claimant is not currently engaged in substantial gainful activity, does he have any "severe" impairment or combination of impairments--i.e., any impairments significantly limiting his physical or mental ability to do basic work activities? If not, a finding of non-disability is made and the claim is denied.

3.    The third step requires the Commissioner to determine whether the claimant's severe impairment(s) or combination of impairments meets or equals in severity an impairment listed

in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listing of Impairments).  If so, disability is conclusively presumed and benefits are awarded.

4.    At the fourth step the Commissioner must determine whether the claimant retains the residual functional capacity to perform the physical and mental demands of his past relevant work.  If so, the claimant is not disabled and the claim is denied.  If the plaintiff carries this burden, a prima facie case of disability is established.

5.    If the plaintiff has carried his burden of proof through the first four steps, at the fifth step the burden shifts to the Commissioner to show that the claimant can perform any other substantial gainful activity which exists in the national economy, considering his residual functional capacity, age, education, and past work experience.

20 C.F.R. §§ 404.1520; 416.920; Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.

1984); Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir.

1997).

Review of the Commissioner's decision is limited in scope to determining

whether the findings of fact made are supported by substantial evidence.  Jones v.

Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir.

1991).  This "substantial evidence" is "such evidence as a reasonable mind shall

accept as adequate to support a conclusion;" it is based on the record as a whole

and must take into account whatever in the record fairly detracts from its weight.

Garner, 745 F.2d at 387.

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step four refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987).  The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983).  However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all.  Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case.  Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform,

then an award of benefits may, under certain circumstances, be had.  E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994).  One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental

contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Id. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments.  Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Cindy Arbuthnot, was found by an Administrative Law Judge (ALJ) to have "severe" impairments prior to her Date Last Insured (DLI) consisting of asthma and a depressive disorder with anxiety.  (Tr. 26).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that there were a significant number of jobs existing in the economy which the plaintiff could have performed, and that she was therefore not entitled to benefits.  (Tr. 27-32). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age of 37, high school education, and semi-skilled work experience could perform any jobs if she were limited to lifting 50 pounds occasionally and 25 pounds frequently, could not be exposed to respiratory irritants, and was limited to a low stress work environment.  (Tr. 896-7).  The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies.  (Tr. 898).  On the other hand, the VE testified that if the restrictions given by the plaintiff's treating physician in May, 2006 were to be accepted, there would be no jobs available.  (Tr. 898-9).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.  It is important to note that, although the plaintiff did not file her application for DIB until December 20, 2005 (Tr. 54-8), her DLI was September 30, 2002 (Tr. 72, 876), meaning that she had to establish disability prior to that date in order to be eligible for benefits.[1]

Mrs. Arbuthnot originally alleged disability due to asthma, chronic bronchitis and pneumonia, and major depression, and indicated that she had been forced to

---

[1] At the administrative hearing, counsel for the plaintiff offered to amend her onset date to September 3, 2002 (Tr. 895), the date of a significant medical evaluation.  The ALJ, without specifically amending or declining to amend the onset date, proceeded to evaluate the evidence between the plaintiff's original alleged onset date of February 14, 1997 (Tr. 54, 65) and the DLI of September 30, 2002.  Therefore, the court will do likewise.

stop working on February 14, 1997 due to the asthma and breathing difficulties.  (Tr. 64-5).  At the administrative hearing in December, 2007, she stated that she did not file for disability until 2005 because her husband was supporting her.  (Tr. 884). She testified that she had stopped working in 1997 due to a premature pregnancy, but had had problems with her lungs, back, shoulder, and muscular pain, and migraine headaches.  (Tr. 880).  She also related a history of depression since the early 1980s, which had required hospitalization two times in 1988.  (Id.).  She had been on medication, however, and had no subsequent mental health hospitalizations.  (Tr. 882-3).  She described serious difficulties with asthma prior to the DLI.  (Tr. 883).  Her other problems were pain from spinal curvature and osteoporosis, neck pain, and muscular problems (Tr. 884-5), and problems with migraines.  The latter problem had not required any emergency room visits.  (Tr. 886).  In describing her functional capacity during the relevant period between 1997 and 2002, the plaintiff noted that she did laundry, but not yard work, and her husband helped with cooking, and she also did drive periodically.  (Tr. 886-7).  They tried to go to church every week, but would skip if she did not feel well.  (Tr. 888). She had a hobby of "scrapbooking," and felt that she could sit for about 30 to 45 minutes, stand and walk 15 to 20 minutes, and could lift and carry 15 to 20 pounds. (Tr. 888-9).

Although the plaintiff has submitted a large amount of medical evidence, only a certain portion of it directly relates to her condition during the relevant period. She was treated by Dr. Rajan Joshi for pulmonary rehabilitation. Dr. Joshi diagnosed bronchial asthma associated with severe deconditioning. (Tr. 448). A pulmonary function test was interpreted as showing only mild obstructive pulmonary disease. (Tr. 455). After the completion of the pulmonary rehab in September, 1999, Dr. Joshi opined that the plaintiff's bronchial asthma, deconditioning, and anxiety were "very well controlled now," noting that the plaintiff had related her feeling that she had done "remarkably [well], when she recently visited Gatlinburg on vacation over the weekend, and she was able to walk long distances without any significant complaints." (Tr. 445). No functional restrictions are suggested.

The plaintiff was seen by a neurologist, Dr. Dora A. Picon, on referral from her family physician for complaints of headaches in 1999. Dr. Picon felt that the headaches were mainly of the muscle contraction variety due to kyphosis in the neck. (Tr. 120, 132). She recommended physical therapy, a cervical pillow, and a muscle relaxant. (Id.). On follow-up, it appeared that Mrs. Arbuthnot had been improving with therapy, but had reinjured her back because she had small children that needed to be carried. (Tr. 119). Eventually, Dr. Picon prescribed the medication Imitrex for headaches. (Tr. 132). The plaintiff returned in 2001, stating that she was having headaches "again," and Dr. Picon obtained an MRI of the

cervical spine which showed multiple level disc bulging without central or foraminal stenosis.  (Tr. 121, 131).  She again prescribed physical therapy and muscle relaxants.  (Tr. 118).

On September 3, 2002, less than a month before the DLI, Mrs. Arbuthnot was evaluated by Dr. Paul M. Goldfarb, a rheumatologist, with complaints of pain in the neck, back, legs, and, at times, the wrists.  (Tr. 125).  Reportedly, two MRIs had been done and were normal, but Dr. Picon had diagnosed fibromyalgia.  (Id.). She described poor sleep, and her husband reported episodes of sleep apnea. (Id.).  Dr. Goldfarb's physical examination was largely normal in terms of range of motion, heel and toe walking, and grip strength, but he found that she had 14 out of 18 positive tender points and diagnosed fibromyalgia.  (Tr. 128).  He felt that this was her primary problem.  However, no functional restrictions were suggested.

Most of the other evidence prior to the DLI is in the office notes of Dr. Frank McBrayer, the plaintiff's family physician, who began treating Mrs. Arbuthnot in 1995.  He treated her for asthma, headaches, and depression, and noted a severe episode of asthma had required her to go to the emergency room in June, 1997. (Tr. 565).  The problem appeared to be somewhat seasonal in nature.  (Id.).  By winter, her main problem was fatigue, but at the time she was staying up at night with a baby.  (Tr. 563).  Another child was born in 1998, and in November of that year, the physician noted post-partum depression.  (Tr. 561-2). Amitriptyline (Elavil)

helped with her depression, however, and although Dr. McBrayer diagnosed fibromyalgia the basis is not entirely clear.  (Tr. 560).  In March, 1999, he noted that the plaintiff had multiple symptoms without much objective evidence and this made him think that the plaintiff was depressed, although fibromyalgia could explain her muscle complaints.  (Tr. 554).  Following a hysterectomy that summer, she reported feeling much better.  (Tr. 553).  It was soon after that he referred his patient to Dr. Picon for headache problems.  (Tr. 547, 550).  By December, her only complaints were chronic shoulder pain and headaches.  (Tr. 544).  She apparently requested disability in January, 2000, but it is not clear what she was told.  (Id.).  Notes from 2001 show continued complaints of back pain and headaches, as well as irritability.  (Tr. 535, 538).

A state agency physician, Dr. S. Mukherjee, reviewed the evidence in March, 2006 and stated that during the relevant period, Mrs. Arbuthnot's asthma remained under good control with medication and her condition was not "severe."  (Tr. 470).  Likewise a state agency psychological reviewer, Psychologist Jay Athy, found no "severe" restrictions due to a mental impairment alone.  (Tr. 483).

Dr. McBrayer wrote a letter dated January 20, 2005 stating that his patient was "totally disabled and will remain disabled" due to asthma.  (Tr. 485).  He completed physical and mental residual functional capacity assessments on May 3, 2006, more than three and a half years after the DLI, placing severe restrictions

on his patient's activities due to diagnoses of asthma, fibromyalgia, chronic fatigue, and major depression.  For instance, he stated that she could lift or carry only 5 pounds, walk one-half of a block, could only sit or stand for 15 minutes at a time, could grasp and perform manipulations, but could not reach overhead, stoop, or crouch, and would need to avoid pulmonary irritants and temperature extremes due to asthma.  (Tr. 486-90).  Psychologically, he diagnosed major depression with a Global Assessment of Functioning (GAF) score of 55.  Despite "good improvement" with medication, she would have either "seriously limited but not precluded" or "poor or no" ability to make most performance, occupational, and personal-social adjustments.  (Tr. 491-7).

State agency psychologist Ed Ross, subsequently reviewing the record, rejected Dr. McBrayer's opinion because there was no medically demonstrated severe psychiatric disorder or psychiatric treating source opinion prior to the DLI. (Tr. 570-83).  He opined that there was no "severe" impairment.  (Tr. 570).

Dr. Amanda Lange, reviewing the physical portions of the record, noted that in 2001 and 2002 through September, Mrs. Arbuthnot was seen with a cough or respiratory infection six times, and on two or three of those occasions her lungs were clear even with an infection, although she did have "minimal expiratory wheezes and rhonchi on other occasions."  (Tr. 585).  There were no reported episodes of pneumonia at the time and her asthma was episodic, and therefore did

not represent a "severe" impairment.  Dr. Lange noted that Dr. Goldfarb had found 14 out of 18 possible trigger points in his September 3, 2002 examination, but the plaintiff herself had reported that her pains would come and go, and that she could do her normal housework, although sometimes experiencing soreness afterwards. (Id.).  She opined that the plaintiff's impairments, whether singly or in combination, did not represent conditions that would interfere with her ability to do one or more basic work activities prior to the DLI.  She rejected Dr. McBrayer's January, 2005 note because the opinion that the plaintiff was permanently disabled was reserved to the Commissioner, and noted that the subsequent residual functional capacity assessment had been signed on May 3, 2006 and was not pertinent to the DLI of September 30, 2002.  (Id.).

The ALJ essentially followed the same reasoning in rejecting Dr. McBrayer's restrictions.  In addition to noting that they were given long after the relevant period, she found that his treatment records for the period did not support such extreme limitations.  The ALJ also reviewed the plaintiff's reported daily activities during the relevant period, which she found to be inconsistent with the alleged restrictions.  (Tr. 29).  The ALJ assigned greater weight to the state agency consultants, but, giving the plaintiff the benefit of the doubt, did find that her depression and asthma were "severe" impairments and limited her to medium level work with certain non-exertional limitations.  (Tr. 30).

On appeal, the plaintiff's primary arguments are that the ALJ did not give proper weight to the opinion of the treating physician or provide an adequate rationale for refusing to accept his opinion.

It is long established precedent that the opinion of a treating physician is generally entitled to great weight, and even controlling weight, if it is supported by sufficient subjective evidence and not inconsistent with other evidence in the record. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985).  There is a further procedural requirement that the ALJ must give "good reasons" for discounting a treating physician's opinion, in order to make clear to any subsequent reviewers the reasons for the weight he gave to the treating source's opinion.  Wilson v. Commissioner of Social Security, 378 F.3d 541, 544 (6th Cir. 2004); Social Security Ruling (SSR) 96-2p, at *5.  In the present case, the administrative decision is well-supported both substantively and procedurally.

Although the limitations given by Dr. McBrayer in 2006 are incompatible with full-time work, according to the VE's testimony, they were given so far after the relevant period that the ALJ could reasonably have concluded that they did not "relate back" to the period before the DLI.  Moreover, Dr. Lange, the medical reviewer, specifically considered the issue and concluded that the evidence in the record did not support such a level of restriction prior to the DLI.  As previously noted, in addition, there is evidence from office notes in the relevant period that the

plaintiff was engaging in a greater level of activity than she perhaps remembered. (Tr. 125, 445).

To the extent that the plaintiff was placing reliance on the September 3, 2003 diagnosis of fibromyalgia by Dr. Goldfarb, as implied by her attempt to amend the onset date to the date of the diagnosis, the physician did not assess any specific functional limitations due to the condition, and reported that she had symptoms only part of the time. The mere diagnosis of a condition, including fibromyalgia, does not equate to a finding of disability. Vance v. Commissioner of Social Security, 260 Fed. Appx. 801, 806 (6th Cir. 2008).

Finally, the case of Warner v. Commissioner of Social Security, 375 F.3d 387 (6th Cir. 2004), cited by the plaintiff in support of the "treating physician rule," also stands for the proposition that the ALJ does not need to give controlling weight to a treating physician opinion where it is contradicted by the plaintiff's own testimony. Id. at 391. In the present case, the plaintiff testified that she could sit about 30 to 45 minutes and stand and walk 15 to 20 minutes (Tr. 898) where Dr. McBrayer had limited her to only 15 minutes of sitting and 15 minutes of standing (Tr. 487). This is yet another reason to discount his opinion.

Regarding the plaintiff's mental limitations, Dr. McBrayer's 2006 assessment also does not relate back to the relevant period, and contains such extreme limitations that it is easy for a reviewing court to understand why the ALJ and the

reviewing state agency psychologists found that it was not supported by any objective evidence prior to the DLI. In addition, it would appear that the extreme limitations described by the physician were inconsistent with his assessment of a GAF score of 55, which equates to only a moderate impairment. Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision), p. 34.

Although the plaintiff submitted a large amount of additional evidence to the Appeals Council, she does not specifically request a remand for the consideration of new and material evidence. See Cline v. Commissioner of Social Security, 96 F.3d 146, 148-9 (6th Cir. 1996). Nevertheless, the court has reviewed the additional evidence but it clearly does not relate to the period before the DLI. Evidence of a subsequent deterioration or change of condition after the administrative decision is not material. Wyatt v. Secretary of Health and Human Services, 974 F.2d 680, 685 (6th Cir. 1992).

The plaintiff makes a general argument that the ALJ failed to consider her impairments in combination, but a review of the administrative decision shows that the opinion was adequate in this regard. See Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). She additionally asserts that her condition meets a listed impairment, but as no specific listing is identified, this argument is deemed to have been waived.

Finally, the plaintiff's arguments regarding the ALJ's failure to consider her ability to hold a job for a significant period of time is without merit, for reasons stated in the Commissioner's brief, Docket Entry No. 7, pp. 12-14.

The decision will be affirmed.

This the 16th day of March, 2011.

**Signed By:**

*G. Wix Unthank*

**United States Senior Judge**